Good morning, and welcome to day three of our panel here in Atlanta. You see Judge Luck and me on the panel. Know as well that our colleague Judge Choflat is on the panel with us as well. He wasn't feeling so hot on Monday, so headed back to Jacksonville. He's going to listen to the oral arguments and will participate in the decision-making process. So please know as you're talking to us that you're also talking to him. A couple of rules of the road. Number one, most importantly, please know that we've read your stuff. We've read the briefs, the underlying cases, statutes, record materials. And so in the limited time that you have before us today, don't waste your own time with lots of factual and procedural windup. Just if you think that there's an issue that drives the decision in your favor, get right to it. Number two, traffic light system you'll understand. Green, you're good to go. Yellow, start winding down. Red, technically means stop. I'm not going to cut you off in the middle of the sentence, but I would ask you to begin to wrap your presentation up. All right. With that, we'll call the first case, which is United States v. Ware, 21-10-539. We've got Ms. Webster here for the appellant and Mr. Hobson here for the appellee. Ms. Webster, whenever you're ready. Good morning, and may it please the Court. Here the District Court abused its discretion by allowing two law enforcement officers to identify Mr. Ware from photos and surveillance videos when they had no familiarity with him prior to his arrest and had such little exposure to him that their testimony was inadmissible under Federal Rule of Evidence 701. In Pierce, this Court emphasized that under that rule, the witness must have some basis for concluding that the witness is more likely to correctly identify the defendant than the jury. The Court in Pierce said that we should look at the totality of the circumstances and listed a number of factors. One, that the witness knew the defendant over a period of time and in a variety of circumstances. Two, that they had interactions in natural settings that gave them a greater appreciation of the defendant's normal appearance. One of the cases we relied on from the other circuits, so we sort of developed the rule and factors from looking at other circuits. In one of those cases, the familiarity was just 70 minutes, I think was the total that the court, the other circuit had relied on. Here we have at least one of the officers who had close to about four hours of experience. Is that do I have that right? I think that's correct, Your Honor. So doesn't that compare well with how at least the rule that we adopted from the other circuit factor? I think there are a couple of differences that distinguish the familiarity that the officers had here with the familiarity that the officers or that the witnesses in the other cases had. First, we have officers who were the ones who decided to go get the arrest warrant for Mr. Ware, who sought the arrest warrant, who obtained it, who executed it, and then were interviewing him. And so all of their familiarity was based on post-arrest conduct, after which, at which point they had already decided that he was the person in question. So I think if it's, if we're talking about, I could see how that would be an important factor if we're talking about a different identification issue. But here the idea simply was the person at the time of arrest, the person that's on the video, which was about a month after, the arrest happened about a month after the video to evidence, the video evidence was recorded. And then now we're two years later where the defendant appears to look a little differently. So it seems to me the key is the time in which you knew the person and how that was relevant to the crime rather than how long you knew. In other words, let's say I had my childhood best friend that I hadn't seen in 10 years. I have a lot of familiarity with my childhood best friend, but maybe not current familiarity with my best friend. Do you see how the current scene is the important factor there? I understand the currency issue, Your Honor, that the more recent identifications are more relevant. I think there are a couple of factors. One, as to the description that he had actually changed his appearance, I just, I don't think that's significant. I don't think that any change in his appearance was significant. What the, I believe the officer said was that he had maybe grown out his hair a little bit. Also on his face though, too, right? Well, just sitting beside him at trial, I don't think that it was obscuring his face such that it might have had a chance. I know you know. I'm just talking, I can only read the cold record. Sure. Was the testimony not that he had some facial hair that did not have before? I don't think that it was facial hair. I thought that he testified that his hair slightly grew up, grew out, which could have obscured part of his face. Right. And then his weight, too? I believe the quote from the officer is that he looks like he, quote, maybe put on a little bit of weight. I don't think that that change in weight is the same sort of disguise or concealment that has been talked about in other cases. I think other cases, it shows some intentional decision to obscure or alter your appearance. And here we just have someone who had aged and who had been in jail for the, since his arrest and for a little bit under two years. Is this discussion we're having, everything you're saying is very plausible and frankly is probably going to be a great argument or would have been a great argument in front of the jury. I'm sure you made it. But once there's that threshold of he's got some basis of familiarity, that basis of familiarity is from the time of the crime, and there's at least some difference in how we look now from how we look then, doesn't the rest of it go to weight? I don't think so, Your Honor. I think there are a couple of issues with that. One is, again, I don't think, even though there was some amount of time that he spent with him, I don't think it was the amount, it was the type of experience with him that the cases envision. They talk about, the cases talk about knowing the defendant over a period of time and in a variety of circumstances, and that you want to interact with the defendant in natural settings that give a greater appreciation of the defendant's normal appearance. Wasn't one of the witnesses in Pierce the probation officer? That is not natural and that is, while post-arrest or pre-supervised release violation, that is not sort of in the natural setting of somebody. I think probation officers can see people in their natural settings, Your Honor. They go and see people at their homes. They interview people. They meet them at their jobs. It's very different from what we have here, which is they go to arrest him after they had already decided that he was the person. They bring him to whatever facility they were interviewing him at, and then they are in the same sort of sterile setting that the court, that courts have described as the sterile courtroom setting. There's not the same sort of familiarity over different circumstances to be able to identify. Can I ask you a couple of harmless error questions? So, in addition, the jury itself got to see the photographs and make that comparison. It wasn't as if, and in fact, they were instructed on identification and the factors they had to consider. So the jury knew it was ultimately up to them to decide if there's there. And then, in addition, you have very strong modus operandi evidence that we've even said strong in similar sorts of multi-robbery cases like this. And, in addition, linking DNA into multiple robberies, fingerprints to multiple robberies, and a lot of tattoos that were similar to a lot of different robberies. Even without the, this ID, it would seem that that might be harmless given the extent of the evidence that was submitted. I have a couple of responses to that. First, as to, you know, the fact that it was presented to the jury and they could also make their own decision. This Court in Hawkins and other, like the Second Circuit in Garcia, talked about the problem with having the case agent, which is what both of the officers who testified were. They were the case agents who have talked otherwise about the investigation. And so they talked about all the other evidence that they had gathered, all the other evidence that had led them to conclude that Mr. Ware was the person. And so when you have the identification coming from the case agents who are already invested, it's basically telling the jury, this is the result that you need to reach. And I think that's what this Court did not like or did not appreciate in the Hawkins decision and part of what led to the reversal in that case, even under a plain error standard, even though here this issue is preserved. As to the other harmlessness question that you asked about, there, I think there are a couple of points to make. First is, this is not a case that the jury, you know, went back and decided in 45 minutes that he was guilty. They deliberated for over seven hours. So there's clearly something that they were looking at and considering. There are a lot of counts here. I mean, there are a lot of counts. If we do it by count, it probably is about 45 minutes per count. I think that brings me to the next point, Your Honor, which is that you have to make this determination on a count-by-count basis and that the court has, or the jury and the court have to assess guilt count-by-count. So I normally agree with that. I probably agree with that more than maybe most of my colleagues do. But we have a lot of cases in these multi-robbery cases where we sort of, under the MO theory, look at, you essentially have a fingerprint of how you commit a particular type of robbery and use that to be able to say that even if the evidence is a little less than count nine, it's still overwhelming because the same fingerprint, and I'm using that broadly, is on all of the different portions. I think there are a couple. So I think the government would like to proceed as though all of the robberies in question were the same. They weren't. There were significant differences between them. So for some of the robberies, there were two people. For some of the robberies, for example, the phone that the government connects with Mr. Ware was found nearby. But in other robberies, it wasn't. So there were also multiple, I think, robberies that did not have any of the forensic evidence in the same way. And that includes the Cochimaru robbery, which is the robbery where the individual actually shot some of the victims. And so you have this robbery without any of the relevant DNA evidence, I think, and a couple of other ones. And they, so the fact that the government then just got to get up and say, this is the person in all of these videos. And I believe the agent Costa specifically identified Mr. Ware from the Cochimaru, from a video or surveillance screenshot of a video from the Cochimaru robbery. And so I think that is why it's not harmless if you look at it on a count-by-count basis, which is what I believe the court is supposed to do. I see my time is about to wrap up. Well, do you want to hit very briefly any of your other issues? Not unless the court has particular questions about them. I was planning to focus on this one. Fine. All right. Very well. You've got your full rebuttal time remaining. Good morning. May it please the Court. I'm going to jump in with the ID issue, since that's what we've spent most of our time on so far. Judge Locke is exactly right that you have to get to the threshold of, is it admissible? And that's an abuse of discretion standard here. And the questions that are relevant to that is just whether there is some basis for concluding that the witness is more likely. I will say, though, if we're focused on a prejudice part of it, and I think that there has to be some focus on prejudice, having the case agent do it, as opposed to just, I've seen this done where there's a family member who calls in, sees the video in South Florida, the Channel 7, they play these videos, and that's my brother on the video. And they call the person and say, yes, I've watched the video. That clearly looks like my brother on there. That, to me, is very different than getting your case agent on the stand to say, I was in the witness box, or I was in the interrogation room with him for one hour or four hours, and, yes, that's the person there. That seems a little different, does it not? It does, Your Honor. But it kind of cuts both ways because, as you pointed out, once you get past that threshold of whether there's a reason for the admissibility, that goes to wait. And that's something the defense can argue. And they can say, this is a case agent. He had made up his mind. He's biased. You shouldn't trust him pointing out which screen time. But even on our relatively lenient standard, right, I mean, like, the case agent's relative expertise vis-à-vis the jury here is pretty slim, right? Yes, Your Honor. I mean, like, I guess what I'm saying is, like, what is it exactly that they, in probative value sense, are bringing to the table? The flip side of Judge Luck's prejudice question. Right. Well, the probative value of the evidence is that why it's helpful to the jury is because in all these hours of video that the jury's going to go back with, the case agent says, I recognized him here in this video, here in this video, here in this video. You all take these screenshots back, and you can do what you want with it. But it's helpful that somebody that saw him at the time, near the time to the robberies,  you, jury, are seeing him two years later. He's grown out his hair, and it's obscured his face at trial. They're looking across a courtroom, sterile environment, as this court has said. He's gained weight, and he's aged by two years. That is the threshold question of whether it's helpful. It's hard to imagine, though, that, I don't know, that you would need someone to identify me at 48 as opposed to 50, and, you know, if I've gained five pounds or whatever. That's just, I don't know. It just seems so slim. Well, Your Honor, the defendant was younger, and with all due respect, hopefully we hit a point where we stop aging, although I certainly haven't hit that point. Don't I wish. I'm getting grayer every day. But gaining some weight and aging a couple of years, growing out your hair two years later in a sterile environment, it just, whether it's thin or, it crosses that threshold. And if it's a close call, and maybe you wouldn't as a district court judge, the district court judge, it's an abuse of discretion standard here. And he, the district court judge, made the determination, I think that they have enough. It was near in time to the robberies, and he has changed his appearance. I'm going to let it in. That is not an abuse of his discretion. And, as Judge Locke pointed out, not only are we under an abuse of discretion standard, we're under harmless error review, and there is significant other evidence. Their point is a good one, though. I am not a fan of this, I'll call it bootstrapping, but what we've done, I mean, we have an opinion where we've even done, like, a checklist of all the commonalities between a crime and said, well, they're all the same, and so the evidence is sufficient there. I'm not sure we can do that in a harmless error analysis. So they focused, as I understand it, on three specific robberies where this was a problem, or three specific counts where this was a problem. As to those counts where there wasn't DNA evidence, there wasn't fingerprint evidence, it's not, all you really have is some obscured video, and even in some you don't have video. How, as to those counts, is this not, was this not powerful evidence? When the case agent himself, who says, I've investigated this, gathered all this evidence, and that's our guy. The MO evidence, and I understand what Your Honor is saying, but you can't say, he 100 percent did robbery one, so he must have done all ten. That's not what we have here. And so, before I move off of the MO evidence and get to, and I will answer questions, the MO evidence is still important. When you have a string of robberies, and the jury concluded this string is by the same group of people, because they see video in seven of the nine robberies, and there's a left-handed robber and a right-handed robber. The left-handed robber has a gold watch in multiple videos. He has a tattoo on his face. The right-handed robber and left-handed robber, they look like the same person in the videos. Whether or not you think it's Mr. Ware is, of course, for the jury to decide. That MO is important. Every single robbery that a getaway car was spotted, seven of the nine, a red getaway car was spotted. And so, you are convinced the same person did that robbery as this robbery, and in this one, the robber picked up a mint, put it in his mouth, pulled off the wrapper with his teeth, put the wrapper back in the dish, and the agent collects it, and you have DNA that is overwhelming, matched to that person. That tells you not only about that robbery, it tells you about the other robbery that you already have concluded, based on MO, was the same person. And so, the MO is important in that regard. And I agree, Your Honor. I want to be clear. Right-handed went into a red car afterwards and did it with someone who's left-handed who wore a watch, right? That's not everything, but that is... Well, that's what you've just said. I'm trying to summarize what you've just told me. I'm just giving an example of what, how that is important. But we can go through all the MO evidence. Sorry. So, in every one of these robberies, they targeted an Asian-run business. They posed as customers when they went in, and they asked for massages, even at places that didn't offer massages, a restaurant and another spa that was just a sauna-type place. They said, can we get a massage? They brandished handguns immediately then and demand money. And it involved, based on the video, there's clear surveillance video of a lot of these robberies. Some of them is a little fuzzy, but it is clear, and the jury got to look at all that. And I believe it's in the record if Your Honors want to look at that. And you can tell it's the same robber at a lot of these robberies. It's two young, thin, black males. One is left-handed. One is right-handed. Distinctive appearance with a tattoo on the face and a gold watch on the left-handed robber in a bunch of the videos. Which is not Mr. Ware. Which is... That's not Mr. Ware. That's Mr. Smith, right? Because they're doing it together, that is still evidence that implicates this. And there is evidence that they had a relationship for a long time. There's a call log on the phone where they have calls all the time to each other. The right-handed robber was significantly more violent of the two. He pistol-whipped people at multiple robberies, and so you have that pattern. You have the common clothing is not just the gold watch. You have the same gray-hooded sweatshirt worn in several. You have this distinctive dope sport jacket that was worn by the right-handed robber in one and the left-handed robber in another. You have an extended magazine in multiple other robberies on a handgun. And then there's the identical red getaway car at all the robberies. So there is extensive MO evidence. And let me be clear. I'm not questioning the sufficiency of the evidence here. But on harmless, your burden is higher than that. Your burden isn't simply to show that a reasonable jury could conclude that person A committed the robbery, that you know person A committed in another day. It is that there is no reasonable probability that the error infected the trial, right? I don't know if it's no reasonable probability. Reasonable probability that the result wouldn't have been the same otherwise without the error. Right, right. Right, and so all that MO evidence is one piece. And so then to get to specific robbery evidence, there is DNA evidence, as we said, that linked him to one of those. There's no doubt for some of the robberies it's clear as day. But they are specifically arguing for three of them. And that's relevant because it would change the guideline score and the mandatory minimums. Well, so that sensing issue, the reason they focused on this, I think she focused on Kochi Maru today, which was the restaurant where the women were shot. Right. That is not one of those three. But for Kochi Maru, we do lay it out in the brief what specifically is in that. But there are pants, and that can be seen on a video of the red car again. Pretty clear video of this. Pants were recovered from the co-defendant's home that matched his. And the MO evidence, it is important on that. I mean, you don't have to have DNA for every robbery. That's just not how it works. And there are, I'm trying to think what else there was for that one. So there was DNA evidence linking to two of them. There was cell site evidence linking to four other ones and his co-defendant to another one. There was clothing and items found at the co-defendant's residence that matched it. And there were searches on the phones that matched several of the robberies. He was actually searching for the address. He's searching for articles about these. He's searching for how to replace a magazine that fell out of his gun at one of the robberies. I mean, he is overwhelmingly connected to the string and to each one. And it all is part of the same story that the jury heard. I mean, that's all the evidence they heard, and they are allowed to rely on that MO evidence. And so the mere fact that the agent said, I recognize him, I thought, in this video, at this spot, here's a screenshot, and in this one, here's a screenshot, and did that for six screenshots and went back with the jury, does not overcome and would not change the result for that, Your Honor. And she didn't get to any of the other issues. I don't know if Your Honors have any questions on those. I think, in fairness, we should leave them alone since she didn't raise them in opening. Okay. Thank you, Your Honors. Very well. Thank you so much. Ms. Webster, you've got your five minutes remaining. Thank you. I just have a few points. I think, Judge Luck, what you're talking about with the MO evidence is I think what you are indicating is that those challenges came in sufficiency of the evidence questions, right? Those are how that was raised. I think one of those was the Pendergrass decision, which was one of my cases, and that's what we had challenged there, the sufficiency. I believe I was on the panel. Yes. So that was sufficiency, which is obviously, as you said, a different indication or a different issue as opposed to looking at the harmlessness. But your opposing counsel isn't wrong that in the harmlessness, it's still evidence. In fact, I think there was a specific instruction allowing the jury to consider extrinsic acts for each specific crime. And so it still is evidence at a jury and that we would consider in making the harmlessness analysis. So with that, and your opposing counsel laid it all out, explain to me how, even if there is error, how this meets the harm. The government has not met its burden under the harmless error testing. Sure. I think the government, a couple points I think are not necessarily correct. So, for example, the fact that Mr. Smith was proved to be involved in some of the robberies does not necessarily prove that Mr. Ware was involved. Just because they could have been involved in some robberies together doesn't mean that because we know that there's a third person involved. So you know that there are other people being involved. So there's no way to say for sure that because Mr. Smith was involved that Mr. Ware was the person that was with him. I'd also point out that there are other ways that the government could have — there's a very clear video from the interrogation that the government could have easily presented and allowed the jury to make the same or to at least give them the opportunity to make the same identification. The interrogation was not introduced in evidence, correct? I don't believe so, Your Honor. I assume it's because it had false exculpatories in there. I'm sorry, Your Honor. I assume there's no admission. There's no inculpatory evidence in there that the government would have needed. I have to say I haven't reviewed his statement in a while, so I cannot remember exactly what he said. I think that he denied everything in that statement. But you can still take screenshots or something from that to allow the jury to make this comparison as opposed to having the case agents come in and say, yes, that is the person. And I just — to the harmlessness part, for each of these counts or for the substantive counts and the 924C counts, there is, as you indicated, a mandatory minimum on each of those. So it makes a significant difference to his sentence, even if you just find that there is insufficient evidence as to one of the robberies. Unless you have any further questions, I'm happy to conclude. If you could just, with your last — tell me which counts specifically — I know you made the argument as to all of them, so it's not a preservation issue. So I'm not telling you to waive anything. But which counts in particular do you think are the most harmful — the error was most harmful to your client? That would be helpful. Sure. I'm sorry, Your Honor. I don't have the counts in front of me. I think the robberies — Can you tell me the robberies? That would be helpful. I think it's Kochi Maru, the Empress robberies, and the BD robberies. Very well. And, Ms. Webster, we note that you were court appointed. And we certainly appreciate your service to your client and to the court. Thank you. Thank you. All right.